Next case for argument is 25-1281 Melinta Therapeutics v. Nexus Pharmaceuticals. May it please the court. For the 802 patent, the district court first erred by administering in such a way as to override the consisting of claim term in the asserted claims. It's a legal issue where consisting of is not disputed between the parties, what that means. It's controlling authority about that issue. And the court was therefore right to limit the term consisting of to the three excipients, three ingredients listed in the claims. The trouble arose because the court, when looking at the word administering, rather than just say this is what the claim says to administer, is that composition, let's look at other world evidence regarding extrinsic information about how experts testified regarding the usage of the drug in practice and work backwards to inform the claim construction, which was error. Specifically on Appendix 29, there is an assessment of expert testimony by the district court, which identifies Dr. Friedman, an expert by Melinta, testifying about how APOSA would use the product, and that was infringement testimony. And that's at Appendix 1515 is the transcript citation for that testifying material from the district court. That analysis was error because the court should not be looking at the commercial product, should not be looking at any usage, should not be looking at any of the extrinsic information, particularly whereas here the district court correctly construed consisting of and the specification used that, described that formulation and the claims used the terms consisting of three different places. The consequence to that consisting of usage is non-infringement because it's also undisputed that Nexus in its actual formulation does add additional materials in the form of a diluent or an IV bag that has other excipients that are not claimed, and therefore as a matter of law, because of the claim construction error, the finding should have been non-infringement and therefore the judgment of infringement should be reversed. So are you saying that the composition is really the combination of the components plus the diluent, or are you saying that the administration has to be viewed differently from the composition? I'm saying the composition does not have diluent in it, which the district court also said, and administering is that composition again without diluent in it, that's what the claim is requiring. Administering the composition without the diluent. Correct, that's what the claim requires. So even if no one would actually administer, I know you have a quibble with this, but if it's with the fact that no one would administer the infusion without the diluent, is to administration of only the composition without the diluent. Yes, Your Honor. That's your position. That's what they claim. Let me ask you a question. I'm thinking about different types of treatments. Take something really simple like Alka-Seltzer. You have a capsule, a little tablet. That's the composition, I assume, you'd agree. Yes. You drop it into a glass of water, either a big glass or a little glass, and then you drink it. Well, which is the composition at that point? Is it the water plus the tablet? What is being administered? Is it the tablet or what? I mean, how does that square with your argument? I would square it as follows, Your Honor. In that example, what the patient has ingested is the entire package. But if the claim had said take the Alka-Seltzer consisting of the Alka-Seltzer consisting of the solid components in the Alka-Seltzer, then putting it in water and drinking it, even if that's how that person does it, is not covered by the claim. But that's not how that's covered by the claim. So you're saying that it cannot be read that the diluent is simply a neutral feature associated with the administration of the product. Correct, Your Honor, because that's unfortunately the way they claimed it is administering is the verb that's used and consisting of is used or consists of is used three different times in the claim. And one reading the patent specification in the four corners of that sees examples of the formulation with only those components and nothing more, and there isn't a teaching in the specification that says this must be given with a diluent, which might change things, or that it only can be featured with a diluent. Wasn't there expert testimony that the composition had to be diluted before administration? Yes, Your Honor. And that was the non-infringement testimony from Dr. Chambers, which the judge here also used, the district court, as part of its claim construction, you know, to base the information about capturing the accused product. Yes, it has to be diluted to be used in the accused product's implementation, but that's what makes it not infringed. We don't believe that should be affecting the claim construction. So this patent covers nothing? This patent covers directly administering that composition.  But the record shows no one does that. So it covers nothing. But that's the fault of the claim writers. The fault of the claim writers, you're right, Your Honor. That's the way they wrote it, with consisting of here used so emphatically, as compared to other patents and other claims that used comprising. All right. And that's the consisting of law. The second error on this 802 patent that the district court made was on including the calcium as a comparator for where there should have been a benefit demonstrated over calcium also, covered by the claim. Finding, however, that the claims were still enabled and written description applied, and making no finding on this issue on 112 for the injection site hemolysis limitation whatsoever. The district court. The argument is a forfeiture that you forfeited that argument. Understood. The forfeited portion of the argument that they're claiming is a short, but their argument that the other side also rebutted below at appendix 1162, spending all of a paragraph, most of a page on the argument. This was in the post-trial briefing. Yes, Your Honor. Post-trial briefing. So there was joinder on the issue, and they had witness testimony on the item as well, regarding what was their witness's opportunity to address the issue in Dr. DeVries, which was raised at the fact of the calcium comparison. Well, you didn't have any expert testimony. I guess I'm wondering, even if it theoretically was not forfeited, and you send it back to the district court, what's your record on just the written description part and comparator? You didn't have expert testimony, correct? Correct. We had the admission. You didn't make what seems to be at a minimum a fulsome developed argument with regard to written description, right? We disagree on that, but the degree of fulsomeness we believe is sufficient. Yes, Your Honor. In the Griffith testimony that's cited as well, the best record evidence is the testimony from the inventor that was the admission about A1825-26, where the inventor, Griffith, explained that there was no benefit of using magnesium over calcium as a combination product. Everybody agrees with that proposition, effectively. I mean, the whole patent is written about both magnesium and calcium. So they elected to claim only magnesium, having discussed at great length the advantages of bivalent and trivalent cations. And why is it then sensible to say, ah, but when they get to the claim, what they had in mind was magnesium better than calcium. There's nothing to suggest that they had that in mind. I don't see where that would be a sensible construction. That construction is not challenged, Your Honor, and that's Appendix 40. Well, I'm suggesting that we might be interested in challenging it. Understood. As wrong. Well, the claim scope, as construed by the judge, did include the calcium as a comparator. And we believe that was correct because the word choice that was not used on purpose was it just says without magnesium. It should have or could have said without magnesium or another cation, or it could have just simply said minocycline alone as the comparator. And there was nothing in the findings of fact, right? There's nothing in the findings of fact. So, I mean, there's no way. Forget whether we should remand it, but certainly here on appeal, we don't have a record to review. I'm having a hard time seeing that even if you've got a remand in the absence of any additional testimony or record evidence that the district court would be in a position to resolve this in any real way. Do you understand my point? I do. It may be limited, Your Honor, but I do believe it's sufficient to have the claim construction, Griffith's inventor testimony, and Dr. DeVries talking about the calcium comparators and, of course, the specification itself, Figure 1, Appendix 138, confirming the same thing about the calcium versus magnesium. You're talking about additional arguments that are made to the district court. I'm talking about what is currently in the record, in the argument, by virtue of the citations that were already in that section. And as limited as it is, the Rule 52 issue is that there were no findings on written description or enablement at all for this issue, not just this part of the issue. The district court clearly recognized the argument was made on Appendix 121. It's identified as argument number one. But then on Appendix 123, that argument is skipped, and Arguments 2, 3, and 4 that the judge listed are then addressed. So there's just nothing on it, and therefore it should at least be remanded for that attention to make sure that that claim construction is applied to the evidence that had been presented. Third, as to the 105 patent, there is a written description and enablement issues regarding the osmolality being less than 500. That claim scope is zero to 500. That's what all the experts were testifying about at trial. The experts gave examples of pure water as an extreme example of a zero osmolality product that would be dangerous to administer. All the experts agreed that there is a number that is too low of an osmolality that's included within the range zero to 500, but no idea what that is. Why isn't it appropriate, more appropriate, to view that osmolality less than about 500 as a negative limitation? Which is to say, we don't care about anything about osmolality except that just don't go over 500. And we're not claiming any particular osmolality, we're just having a negative limitation, just don't go over 500. Why wouldn't that be a perfectly reasonable way to read this, which would not invalidate the claim? Your Honor, I believe that would be a different claim, because then the claim term would say, not exceeding 500, or we're in the osmolality. It says less than about 500. I don't know how that is different from yours. Not exceeding less than, same thing. But there's a slight difference. There is a slight difference. One would cover 500 exactly. I guess that would be true, too. But here, in terms of the 500, because it's a range claim, you're getting into the range, even if it's- I wonder. It isn't a range claim by its terms. It just says, don't go over 500. It's like saying, don't raise the temperature above the boiling point of this composition. That doesn't mean that I claim everything down to absolute zero. I think that, again, I believe that's a different claim, Your Honor, where there's an affirmative instruction to not do something. Here, if the range is where the- It's not talking about a range. It says, osmolality less than about 500. It's not saying from 0 to 500, or 150 to 500. I believe that's a range, and it consists with the law on a number being a benchmark or threshold. If it's above a number or below a number, like in Maxil, it could be above a threshold number, and the instruction would be just go above it, but it doesn't necessarily require one to go to infinity. Nonetheless, that's what the claim scope does address, and therefore it should be included. If I go to the restaurant around the corner, Cheesecake Factory, which has a menu that consists of about 50 pages, and one of those pages says every plate or every sandwich listed on the sheet is less than 500 calories, do you think that I'm going to assume that something on that sheet is 3 calories or 30 calories? Perhaps not. It's Cheesecake Factory. We don't know where the line is to be drawn, though, either. You had expert testimony. Wasn't there expert testimony? There was no expert testimony on where that line is to be drawn. The expert testimony was that it should be, one target should be around 300. That was Dr. Klibunov at Appendix 1883. I saw it. Okay, but you're missing examples from 0 to 150, right? 0 to 150 is what's missing, and as to that area, Dr. Friedman testified on Appendix 2130 that there can be too low of an osmolality, and Dr. DeVries testified at Appendix 2267-68, again, that there should be a hypotonic range, but we don't know what that is, and Malinta referenced a document, the Broadhead article at Appendix 2570-71, that, again, said there's a hypotonic range that can be dangerous, which is included within the scope of the claim, and here, there's no teaching about how to avoid it. Okay, maybe I'm missing something, but didn't your own expert concede that lower osmolalities would not work? Wasn't there testimony from your expert? That would not work. Yes, that would not work. Lower osmolalities would hurt the patient, and it's not that they couldn't be formulated, it's that they would hurt the patient, and then they were administered, and that's what made it a problem that it was still claimed as part of the method of treatment to give those low osmolality formulations to a patient. But wouldn't that testimony also support a conclusion that that wouldn't be covered? There's no need for written description or enablement because that range is not realistically covered? No, Your Honor, because we don't know what that range is. To this day, we don't know what range is and is not covered, and it's left to a person of awareness, skill, and the art to test it and to come up with it, and it's an example, therefore, of over-claiming, because had there been guidance about what is an appropriate osmolality and what is not an appropriate osmolality, that would have been different, or had the claim just matched what they actually tested, which is the range is above 150 to 200. Otherwise, what we're doing is we're leaving it to a person of ordinary skill and the art, which the Alza case said cannot be done for the case of written description and enablement. But let's say we look at the record another way, where there were two examples given. One was 275 to 375. We know that that's in, and the other was 150 to 250. So that kind of indicates what the bottom range is, which is 150. Had they claimed it that way? Yes, Your Honor, but they didn't. And that leaves us with a fourth point about the pH range, which is a similar analogous example of over-claiming by claiming the entire range of pH 4 to 7, when the specification itself confirms that that range does not work for all kinds of patients. You're not making a written description argument with respect to that limitation. For that one, it's enablement, because the information that's given is basically a roadmap for how to do further work and research to identify what formulations might work. And this is a question of enablement here. Yes, Your Honor. And when we consider enablement, we look at the patent or the claim at the time of filing. Yes, Your Honor. And at that point in time of filing, the patentee claimed the full scope. We have to look at the full scope of the claim in order to fully understand what was claimed at the time of filing, correct? Yes, Your Honor. And here, even those danger points that we're talking about, those were claimed. Exactly, Your Honor. And so that's why we believe those are invalid. And especially with AK Steel, looking at the specification and making exactly this kind of analysis should result in the same finding. So if we were to just look and look at the claim and say, well, we're not going to consider, we're going to allow, or we're going to buy into the argument that a person of ordinary skill would not go down into these danger zones of the range, that would be a failure on our part to not consider the full scope of the claim. If we're talking about the pH range, there's the issue of going too high to lose the stability of the claim. And yes, that would be a failure on the part to ignore the specifications, which is showing what should not have been claimed and yet was purported to be claimed anyway. That's what makes it invalid. Yes, Your Honor. I'll reserve the remaining time. Thank you. May it please the Court. Damian Dombrowski. Go ahead. May it please the Court. Damian Dombrowski for the appellees. I just want to emphasize. Sorry to interrupt, but I forgot to ask your friend a kind of ministerial question. In order for your friend to prevail, does he need to prevail on both the 802 and the 105 patent or if you win on either one of those patents? Is this case over? This was the first thing I was going to say. Oh, sorry. No, there are no overlapping arguments or issues between the two patents here. So if the Court affirms on either patent, it's enough to affirm the injunction. These stand together? I'm sorry. These patents stand together? No, none of the arguments or issues overlap here. But the expiration dates for both patents are the same? Correct. Okay. Correct. And I was going to take the arguments in the same order that my friend addressed them. And I'll start with the claim construction argument regarding consists of. And my friend referenced the factual finding that the district court made at appendix 29. And I want to sort of walk up to that because I think that's the key finding. So I think we're talking about the same relevant portion of the appendix. The defendant here is only looking at the claim language, but the district court correctly construed these claim terms in view of the claim language and the actual examples of the claimed composition and specification. The poser would focus on the composition recited in the claim and understand that it's a specific minocycline composition having the three recited ingredients. But also I take it containing a solute, right? So it's a solution, an aqueous solution of minocycline. So when we talk about the three components, so there's the three starting components, but you add this aqueous solution. Not the diluent, but the aqueous solution, which complicates things a little. You want to explain where that fits in the composition characterization? Absolutely. So you're correct. The claimed composition is a solution of minocycline magnesium cations in base. And what I'm saying here attracts the district court's analysis as well. A poser would look at the actual examples in the spec of that composition. So having those three recited ingredients in an aqueous solution. And would see that the spec expressly describes those examples of the claimed composition as the reconstituted solution in a very small volume of water. And a poser would understand those are examples of the composition that's intended to be intravenously administered in the claim. So which is the composition? Is it the pre-aqueous solution or post-aqueous solution? Setting aside the diluent for now. Right. Post-aqueous. So it's after you've reconstituted the lyophilized solid. So the district court, the specific factual finding I want to emphasize here at appendix 29. The district court found that all the evidence, and this is from both sides experts, strongly indicates that the poser would understand that those actual examples in the spec of the claimed composition cannot be injected straight into a vein. They must be administered through an IV bag in which they get mixed with this diluent. Why does that change the result here? I mean, all that demonstrates, as everybody agreed, this composition is not workable. I mean, why wouldn't that be the conclusion to take away? All the experts say this couldn't work without the dilution. Why isn't the result of that, that this composition is unworkable and patent owner misses out? Well, we think the experts agreed that a poser would view those compositions as being what is used in the claim and would not see any tension there because the spec also describes this process of further diluting the reconstituted solution in order to administer it. Well, how do we use that? I mean, it's troubling. I mean, if you have 15 steps in a claim and there's one crucial step that's missing, but every poser would say, well, we know necessarily that that would have to be an interim step in the process in order for it to work. So we just rewrite the claim to include that. I don't think it's rewriting the claim, and I don't think it's missing any step here. I think the poser looking at the administering step, the single step of administering in the claim, and then looking at the actual compositions, the examples of the composition that's meant to be used in that claim, along with the spec language about diluting in order to administer, would understand that the dilution is part of the administering of that composition that's exemplified in the claim. And I want to emphasize, too, that that factual finding that the district court made there was not based on later approved products nor on the accused product, the way my friend characterized it. The district court there in Appendix 29 cited both sides' expert testimony about the spec, and the district court actually cited and quoted their expert where he was asked specifically about Formulations 2 and 4 in Column 38. So that testimony is about the intrinsic evidence. It's about the compositions in the spec. It was not about the accused product and working backwards. And where the product label was mentioned in any of the evidence here, it was always made clear that includes the label for the prior art product, which is intrinsic here, and I'll touch on that again in a second. But I want to be clear here. Construing the claims as the way the defendant has requested, so to exclude diluting the compositions disclosed in the spec when administering them necessarily means that all of the specific embodiments of the claim composition in the spec are inoperative. An opposant would just not read the claim that way in view of this intrinsic record. And they cite the Chef America case in reply. They don't explain it much, but they cite it. In that case, this court affirmed a construction that rendered the claims inoperative only because the claims there were susceptible to only one interpretation, and that's just not the case here. It is the heating the dough to a certain temperature. But that's not the case here. There is a reasonable interpretation of these claims that consists of composition and administering that is supported by the intrinsic evidence. It's consistent with it and supported by it, and that does not render the disclosed embodiments inoperative. So we think it's not necessary here to construe the claims in a way that renders them inoperative. In this case, this court, in vitrionics, required highly persuasive evidentiary support in order to justify a claim construction that renders the preferred embodiments in the spec inoperative. I suppose you could have a composition that is intended to be ingested which has an enteric capsule around it that is anti-acid, and so it will find its way through the stomach without dissolving in the stomach, where it would be broken down, and is intended to get into the intestine. And you would naturally say the composition is the things that are inside the capsule. It doesn't include the capsule, which is merely a means of administration. That seems to me to be somewhat parallel to this situation, don't you think? I don't disagree with that. I think it's a different mode of administering, so there's lots of other complications. The mode of administering here is something that's necessary for intravenous administration, that is to say the diluent. And it isn't regarded as part of the composition simply because it is one of the things that ends up in the patient, as in my case of an enteric capsule with the composition inside. I think that's right. I think we are not of the view that there's any sort of contradiction between saying the clean composition is what's being administered here, even though the actual fluid that's reaching the patient may be mixed with a diluent. I just want to touch on the consist of language itself here, because there's a meaningful purpose behind that language based on this intrinsic evidence. It prevents other ingredients in the composition, like solubilizing and stabilizing agents, like oils and antioxidants, which the spec expressly describes as excluded and which are discussed in the prior art cited in the spec. The district court made a lot of findings about this in the context of obviousness. The district court found that the clean composition excludes those ingredients which the tetracyclic prior art taught were necessary. That's at appendix 113 to 114. So we are honoring the consist of restriction here in our position. We're not reading that out or eviscerating that. What do you say about this does not include magnesium limitation? Because as I read the clean construction adopted by the district court, it is unfavorable to you. And I don't find a way that the district court later came back and drew out the implications of that clean construction. What do we do with that clean construction? To give the background on that, we had proposed our construction in order to head off this confusion about the comparator because we think the spec and all the intrinsic evidence is clear about what the comparator should be. The district court chose to stick with the plain and ordinary meaning of does not include magnesium and did not further construe that term. But we're okay with the district court's explanation of the plain and ordinary meaning because he made clear that the comparator is the claimed composition but you take out the magnesium. That's what you omit to make the relevant comparison. Nothing in his clean construction explanation suggested that the comparator is some other composition where you take out magnesium and you put in calcium. So I agree he rejected our construction, but his explanation of the plain and ordinary meaning is consistent with what we're saying here about the proper comparator. And elsewhere in his opinion, he made numerous factual findings and applied the proper comparator in resolving the other issues in this case, including addressing their 112 arguments regarding this homolysis claim term, which he did not have a separate heading in his opinion for that section, but he did address those arguments at Appendix 34 to 36. And the focus of their arguments there were about the lack of in vivo examples. But nowhere did the district court say or acknowledge anything suggesting that he was even aware of this calcium comparator argument because it wasn't raised. And I want to touch on that waiver argument to Judge Post's comments earlier. Let me just go back a moment. I'm not sure exactly what your response was to the last sentence of the district court's discussion of the plain construction issue where the court says, the court cannot agree with the plaintiffs if your interpretation that does not include magnesium should be construed to exclude magnesium and any other metal cation. Why is that not pretty problematic for you? I think probably part of the problem here is that nowhere in the briefing or explanation to the district court was this calcium comparator argument framed for the district court. So the district court was sort of construing this in a vacuum based on the spec. And he perceived us as trying to broaden the claim. But we weren't. We were trying to head off this confusion. And a few sentences above that, I think he makes clear that and plaintiff's own expert witness confirmed that magnesium is the metal cation specifically chosen to be used in the invention, the only metal cation in the solution. So that's what's taken out to do the comparison. There's no suggestion there. Where's the sentence you're citing? Just above the one you just read. I'm on Appendix 40, beginning, and plaintiff's own expert witness. So I think it's clear when you read his opinion, he's imagining the claimed composition and then you take out magnesium to show the comparison. He's not suggesting that you open the door to some other comparator where you're bringing in whatever. And the extreme literal interpretation of a composition that does not include magnesium is like an ad absurdum. It could be a composition without minocycline at all or with some homolysis-causing agent in it. That would make no sense for a comparator in this sense. The whole point here is to be able to assess whether magnesium is reducing homolysis. And the way to do that is magnesium versus no magnesium. And that tracks all the examples in the specification, as you mentioned earlier, including the examples that they focus on in the briefing where both magnesium and calcium were tested. Even in those examples, there was also a minocycline-only formulation as the comparator. Are there other patents out there in which you have gone back to this spec and claimed calcium? I don't know if any of the pending claims have considered that as an alternative, but I think there's support here in the spec for... The spec deals with at least both magnesium and calcium and perhaps the indication trivalent cations. And has data to show that calcium also reduces homolysis. In fact, it looks like calcium does a little better. Their comparable was the evidence at trial, but I agree that the numbers look similar. So there's support in the spec for a claim like that, but I don't know if we've actually claimed that in this family. To crystallize our waiver point, to Judge Prost's comment earlier, written description is an issue of fact here. Nowhere in their proposed findings of fact that were submitted to the district court after trial did they ask the court to make any findings about calcium or a calcium comparator or anything having to do with this argument. So regardless of that one sentence in their post-trial brief, this is waived just because they never put in evidence or any proposed findings of fact for the district court. That would have been needed for the district court to find for them on this. I don't want to run out of time before talking about the 105 patent. The 112 arguments here, osmolality and pH, which are both unique to the 105 patent, they put in some superficial testimony on these arguments at trial. But we're arguing here that their evidentiary record was insufficient as a matter of law under Alcon v. Barr for finding of lack of written description or lack of enablement. They did not put in any evidence on undue experimentation or lack of possession, so they can't meet the threshold showing required by Alcon for either of these arguments. Their experts did not give those conclusions regarding undue experimentation or lack of possession. And they also did not testify regarding any of the underlying facts that would have been needed to reach those conclusions. Do you see the 500 osmolality, less than 500, to being a negative limitation or a range? Well, we certainly took the approach in the briefing of the open-ended range cases, the Anderson cases. Why isn't it a negative limitation? Well, all of the focus, or a lot of the focus at trial on this limitation, all of it, actually, was on that 500 number as a maximum level. No one focused on the rest, because it was supposed to be a do not go above this limitation. That sounds like a negative limitation. And I think that's a fair interpretation. It wasn't briefed that way, but the focus is on... So I didn't see that in the brief. We did not characterize it as a negative limitation, but we did emphasize that the focus was on the 500 as the standard of care. That's what all the practitioners agreed you don't want to exceed. No one's focused on going to pure water at the other end. That's not something any of the experts... And you cited cases that involved open-ended limitations, Anderson and Scripps, I think, and there may have been another. Right. And actually, of those cases, I'd like to emphasize the Regeneron case. Regeneron is the other case, yeah. Yeah, Regeneron is a written description case, but it cites the Anderson, which is written description and enablement. And the reason why that case is analogous to our case here is the limitation there was at least 98% of a protein being in a certain conformation. So it was a recited lower limit. But given the value being expressed there in percentage, there's a hard numerical ceiling of 100%, right? But this court affirmed the district court's finding that a POSA would understand that at least 98% has an inherent upper limit that's less than 100%. So it's analogous to our situation here where we have a hard numerical floor of zero because you can't have a negative osmolality. But a POSA would perceive less than 500 to have an inherent lower limit that's above zero. So we think that case is analogous here. It's probably the closest case in that set of cases, Judge Bryson. So what do you say is included in the scope, just what you're, the limits of what you're, the witnesses, the experts testify? The 150 to the 375? Well, those are the examples in the patent. And those examples, those two examples that have those ranges, there's no evidence that those two compositions are not representative of the full scope of the less than 500 limitation. They didn't put in any evidence on that. And the osmolality here is dictated by the ingredients in the composition. So they have not put in any evidence of an inoperative embodiment here. So having the claimed ingredients, not just pure water, but having the claimed ingredients and then having some inoperative osmolality less than 500, they haven't put in any evidence like that. Their experts never addressed embodiments less than 150. This is entirely in the briefing. But there's nothing in the record to show that there's some problem there from a POSA's perspective. How did the osmolality limitation find its way into the claim in the first place? It struck me in reading the claims and the spec that you didn't need the osmolality limitation. It was just, it's created problems for you, but I don't see why it was necessary. Was this something the examiner insisted on? I don't recall whether that, that's certainly not been in any of the trial court or the appellate court briefing regarding that aspect of the file history. I don't remember if that was in the initial claims as filed, that limitation. I agree it's not necessary for the inventiveness of the claim to have that osmolality because it was a known standard of care.  I think I understand your argument as to what a person of ordinary skill would do with this claim, but the pen T could later bring a claim of infringement on a composition that has 100 osmolality, right? If it had the claimed ingredients that met the other limitations of the claim, it's potential, and the evidence here... That's because the scope of the claim is defined at the filing of the application of the pen, at the time of filing, not 15 years later or 10 years later. Correct, but the specification is not required to have examples of every embodiment within the scope of the claims, and the fact that the embodiments in the spec only went down to 150 does not mean that it couldn't... And there is expertise... In looking at the scope of a claim, we first look at the scope of the claim itself, not at the specification or written description. We have to take the claim the way the claim exists. Absolutely. And here it includes a composition of 100 osmolality. It would, and the evidence is that OPPOSA would understand from the examples that you can make it work and that you can lower osmolality less than 150. Our experts said that as well. We don't think there's a problem with that because there's no evidence that if you could have the claimed ingredients which dictate the osmolality... Would there be a problem of enablement at that point? No, because here... If you had a composition with the claimed ingredients in it in all the right proportions per the claim elements, it's possible that that could be at 100 osmolality and that would be fine. The fact that the specification doesn't have an example of that is not required. But there's no evidence here that you could not have an embodiment that has an osmolality of 100. The only evidence here is that pure water wouldn't work or something very close to pure water where what you're giving is so dilute it could be unsafe because it approaches pure water. I just want to finally touch on the pH argument. They point to the Table 30 in the pH 6 and pH 7 embodiments there. Those embodiments are soluble at 1 mg per ml and 5 mg per ml when you have the high molar ratios of cations. The expectation in the prior art was that adding cations to minocycline would cause insolubility. And what that table shows is that surprisingly at high molar ratios you can have it soluble at those concentrations. Everyone agrees here if it's soluble it can be intravenously administered. So everyone agrees on the link between solubility and administratability. What they have no evidence on here is a link between low concentration and somehow it becomes inoperative to treat infections. They put nothing on that at trial. The spec itself here says that at least 1 mg per ml of minocycline is sufficient and that's what the embodiment in Table 30 uses. And there's no claim limitation here on concentration. So they really have no inoperative embodiments on either the osmolality or the pH argument here. They didn't put in any evidence of that. Excuse me. Thank you. Thank you. Returning to the same order for the first issue on the 802 and the claim construction. Can I... Yeah, please. But just the ministerial question we asked your friend. Do you agree that the patents, as Judge Bryson asked, have the same expiration and that in order for you to prevail you would have to win on both the 802 and... To reverse, yes, that's correct, Your Honor. I do. For the reconstituted formulation, one thing I wanted to confirm as far as that claim construction on administering is that the specification does describe an aqueous solution that on the face of it could be administered. It's only on extrinsic evidence that the judge relies upon to conclude otherwise. Referring to A163, Example 13 has Formulations 1 through 4. Formulation 2 is the one that's reconstituted as one of the examples with water. Nothing else, no other diluents. And that's where the osmolality is also reported. So reading that, there's no information to suggest that that formulation shouldn't be administered. To the contrary... What formulation is that again? Formulation 2. To the contrary on... And what column? Column 38, lines 15 to 25. And specifically at line 17, the formulation is reported as,  suitable for intravenous administration, end quote. So it doesn't leave to doubt in the intrinsic evidence what should be that particular term. And because of the consisting of usage that my good friend has not addressed is to say, why would we add back in something that was taken out by the choice of claim terms that had been used? There is no basis or justification to have that. How do we know that that formulation is administrable without a diluent? The phrase, suitable for intravenous administration on line 17. Right, but it doesn't suggest, or at least it doesn't say, suitable for intravenous administration even without a diluent. It doesn't have that additional phrase. Is the diluent recited in every other example in the patent where something is referred to as being administrable by intravenous injection? A diluent is described in the general background as another optional add-on, which could have been claimed. Yeah, but what I'm trying to get at is what about this formulation two that you've called our attention to tells us that the diluent is not implicitly suggested by that formulation? I think it's more important that it doesn't have the opposite implication, that a diluent is required or would be, particularly with that phrase.  So is there anything about this language that I can come away thinking, aha, this does not, this is indicating it doesn't require a diluent. If there is, I'd like to know what it is. Well, then I would reiterate the osmolality reporting. Why is there an osmolality reporting for something that wouldn't ever need to be administered? That's the point of that claim limitation is to say this is the osmolality that's claimed, and if it's going to change into something else with the diluent, then that should be the osmolality reported as the thing to be injected. So that would be my answer to that question. Could the osmology claim be read on a composition that has an osmology of 5 or 10 or 0? It does. And there's no inherent lower limit, and that's one of the concerns that counsel raised, that there is an inherent lower limit, but there isn't. Unlike the case of Regeneron where purity, there's 100% physical limit, there is no lower limit. It's slightly above zero. There are ingredients required, but there's no amounts of those ingredients required. So yes, Your Honor, and that makes it invalid. Finally, on the pH limitation, the claim does not have, as my colleague agreed, does not have a concentration requirement. So it's broader than what actually works, and that's what gives this claim the impression of a goalpost or an analysis that requires further attention. There is actually an admission in the patent, appendix 191 that we identified in our briefs, column 33, lines 46 to 48. The interpretation of table 30 is that at higher pHs, introducing a cation can reduce solubility. And it gives an example of how the pH effect hurts the opportunity for solubility, and yet the claim still includes 7. And so the pH limitation here, including, is a much broader over-claiming analysis. Table 30 is an introduction to do experiments for a POSA to figure out additional information, and for that reason renders it invalid. In conclusion, Your Honors, there's the quid pro quo that had not been met here for the 105 patent, and as a matter of law for the 802 patent, claims destruction should be reversed as well. Thank you.